**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

JAMES O. MURRAY, III,

                                   Plaintiff,

         v.                                                    No. 10-CV-1440
                                                                  (NAM/CFH)

T. ARQUITT, Correction Officer, Upstate
Correctional Facility; NORMAN BEZIO, Director
Special Housing, Inmate Disciplinary Programs,
New York State Department of Correctional
Services; B. BOGETT, Correction Officer, Upstate
Correctional Facility; B. CLARK, Correction Officer,
Upstate Correctional Facility; B. FISCHER,
Commissioner, New York State Department of
Correctional Services; B. GRANT, Correction Officer,
Upstate Correctional Facility; J. HERBERT, Sergeant,
Upstate Correctional Facility; J. LARAMAY, Lieutenant,
Upstate Correctional Facility; F. MANLEY; J. McGAW,
Correction Officer, Upstate Correctional Facility;
ALBERT PRACK, Acting Director Special Housing,
Inmate Disciplinary Program, New York State
Department of Correctional Services; T. RAMSDELL,
Correction Officer, Upstate Correctional Facility;
D. ROCK, Superintendent, Upstate Correctional
Facility; C. ROWE, Correction Officer, Upstate
Correctional Facility; STANLEY TULIP, Correction
Officer, Upstate Correctional Facility; UHLER,
Deputy Supt. of Sec. Serv., all in their Individual
and Official Capacities,

                                   Defendants.[1]

_____

**APPEARANCES:**                                    **OF COUNSEL:**

JAMES O. MURRAY, III
Plaintiff Pro Se
95-A-4417

_____

        [1] In his acknowledgment of receipt of summons and complaint, defendant "Herbert"
spelled his name as "Hebert."  Dkt. No. 22.  The Court notes the discrepancy as mere
error on Murray's part and proceeds with the latter spelling in this Report-
Recommendation.

Upstate Correctional Facility
Post Office Box 2001
Malone, New York 12953

HON. ERIC T. SCHNEIDERMAN                    COLLEEN D. GALLIGAN, ESQ.
Attorney General for the                     Assistant Attorney General
   State of New York
Attorney for Defendants
The Capitol
Albany, New York 12224-0341

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

**REPORT-RECOMMENDATION AND ORDER**[2]

Plaintiff <u>pro se</u> James O. Murray, III ("Murray"), an inmate currently in the custody of the

New York State Department of Correctional and Community Supervision ("DOCCS"), brings

this action pursuant to 42 U.S.C. § 1983 alleging that defendants, sixteen DOCCS

employees, violated his rights under the Eighth and Fourteenth Amendments.  Compl. (Dkt.

No. 1).  Presently pending is defendants' motion for partial summary judgment pursuant to

Fed. R. Civ. P. 56.  Dkt. No. 103.  Murray opposes.  Dkt. No. 116.  For the following

reasons, it is recommended that defendants' motion be granted.


**I. Background**

The facts are related herein in the light most favorable to Murray as the non-moving

party.  <u>See</u> subsection II(A) <u>infra</u>.  At all relevant times, Murray was an inmate at the

Upstate Correctional Facility ("Upstate").

---

[2]  This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

## A. Assault - Plaintiff's Account

On December 3, 2009, Murray was experiencing chest pains and requested emergency call out. Murray Dep. (Dkt. No. 103-15) at 12–13. Non-party Nurse Travers brought Murray to the infirmary for an EKG. Murray Dep. at 14–18; Dkt. No. 103-11 at 15–16. At the infirmary, medical personnel gave Murray an EKG and concluded that Murray's symptoms resulted from indigestion. Murray Dep. at 24–25; Dkt. No. 103-11 at 20. Non-party Dr. Weissman examined Murray and concluded that there was nothing wrong with Murray. Murray Dep. at 32.

Defendants and Corrections Officers Arquitt and Tulip escorted Murray back to the cellblock. Murray Dep. at 32–33. Murray was handcuffed in the front and had on a waist chain. Id. at 23; Dkt. No. 103-11 at 28; see Compl. ¶¶ 1–2. Tulip walked behind Murray and Arquitt walked in front of Murray. Dkt. No. 103-11 at 63, 72; see Dkt. No. 103-11 at 21. Murray contends that while Arquitt was opening a door, Tulip hit him on the back the head. Murray Dep. at 34–35; see Compl. ¶¶ 1–2. Murray believes Tulip then tackled him. Murray Dep. at 53. Murray thought to go through the door because that area was visible to a video camera. Id. at 35, 55; Dkt. No. 103-11 at 21. Several corrections officers arrived and proceeded to assault Murray. Murray Dep. at 36. Specifically, Arquitt twisted Murray's ankle. Dkt. No. 103-11 at 21.

Murray was then escorted to the infirmary holding pen. Murray Dep. at 53–54. Murray alleged that, while still in a waist chain and handcuffed, defendants assaulted him in the holding pen. Id. at 51–52, 55; Dkt. No. 103-11 at 22. Specifically, Grant pressed down on Murray to the point that Murray could not breathe. Murray Dep. at 52–53. Murray reacted by trying to bite Grant's hand. Id. at 66. The officers stood Murray up against a wall. Dkt.

No. 103-11 at 23.  An unidentified officer ran a finger down Murray's back, hit Murray in the kidney area, spun Murray around, and attempted to hit Murray with his knee.  Murray Dep. at 57, 59–60.  Murray brought his own knee upward to block his groin area.  Id. at 60.  The officer attempted to hit Murray a few times before Murray fell to the ground.  Id. at 60–61.  The officers proceeded to kick and hit Murray on the floor while calling Murray racial slurs.  Id. at 63.  Defendant Laramay told the officers to knock out Murray's teeth because of Murray's grievance activities.  Id. at 67.  The officers then sat Murray on a bench.  Id. at 64.  Defendant and Sergeant Hebert arrived, called Murray racial and religious slurs, stated "we'll kill you," and complained about the lawsuits and grievances that Murray had filed.  Id.  Hebert did not use force against Murray.  Id. at 65.

On December 4, 2009, Murray requested sick call.  Murray Dep. at 72–73.  On December 8, 2009, Murray was taken to the Alice Hyde Medical Center ("Alice Hyde") for medical treatment.  Id. at 73.  Murray alleged that at Alice Hyde, he received surgery, had a tube inserted into him to "suck[] the blood out," was prescribed pain medication, and was admitted for three to four days.  Id. at 73–74.  As a result of the assaults, Murray alleges that he sustained broken ribs, a collapsed lung, cuts, bruises, swelling, extreme pain in the back, neck, hip, shoulder, head, mental distress, fear of death, nightmares, flashbacks, sleeping problems, and depression.[3]  Compl. ¶¶ 5–6.

_____

[3]  In his deposition, Murray generally contends that defendants used excessive force against him as part of a conspiracy to retaliate against him for his filing of grievances and lawsuits against them.  See, e.g., Murray Dep. at 38–39, 44–46, 50–52.  Retaliation and conspiracy claims were neither alleged in Murray's complaint nor response to defendants' motion for summary judgment.  In any event, Murray's attempt to allege either claim has failed.

To state an actionable claim for retaliation under the First Amendment, a prisoner must establish by a preponderance of the evidence that:  (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff; and (3)

## B. Assault - Defendants' Account

Defendants proffer a different account of the use of force incidents. Arquitt and Tulip were escorting Murray from the infirmary and as they approached the fire door, Murray turned around and kicked Tulip in the groin area. Dkt. Nos. 103-7 at 7 (misbehavior report), 8 (unusual incident report), 11 (use of force report), 20, 103-11 at 55, 75. Arquitt had

---

there was a causal connection between the protected speech and the adverse action. Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004) (internal quotation marks and citation omitted); Tafari v. McCarthy, 714 F. Supp. 2d 317, 347 (N.D.N.Y. 2010). Here, Murray proffers only conclusory testimony that defendants had violated his constitutional rights in retaliation for the filing of grievances and lawsuits. Murray proffers nothing more going to when and against whom he filed such grievances and lawsuits, the results of the grievances and lawsuits, or his prior disciplinary history. Barclay v. New York, 477 F. Supp. 2d 546, 588 (N.D.N.Y. 2007) (citations omitted) ("Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives."). As such Murray has failed to assert a potential First Amendment retaliation claim against the defendants.

In order to support a claim for conspiracy under §§ 1983 or 1985, there must be "(1) an agreement . . . ; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." Ciambriello v. Cnty. of Nassau, 292 F.3d 307, 324–25 (2d Cir. 2002); Cusamano v. Sobek, 604 F. Supp. 2d 416, 468 (N.D.N.Y. 2009). An agreement must be proven with specificity as bare allegations of a conspiracy supported only by allegations of conduct easily explained as individual action is insufficient. See Iqbal v. Hasty, 490 F.3d 143,177 (2d Cir. 2007); see also Gyadu v. Hartford Ins. Co., 197 F.3d 590, 591 (2d Cir. 1999). Thus, plaintiffs must "make an effort to provide some details of time and place and the alleged effects of the conspiracy . . . [including] facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end." Warren v. Fischl, 33 F. Supp. 2d 171, 177 (E.D.N.Y. 1999) (citations omitted). Here, Murray fails to provide evidence sufficient to support a viable conspiracy claim among the defendants. There is nothing in the record to establish that defendants had any type of agreement between them. There were no allegations outlining with specificity when, why, or how an alleged conspiracy occurred. Warren, 33 F. Supp. 2d at 177. Murray fails to provide any plausible information which would lend credence to a claim of an explicit or implicit agreement between any or all of the defendants. Anilao v. Spota, 774 F. Supp. 2d 457, 512–13 (E.D.N.Y. 2011) (citations omitted). As such, Murray has failed to allege any potential conspiracy claims in this action.

Accordingly, Murray's potential conspiracy and retaliation claims must fail.

turned his head slightly and saw Murray kicking Tulip. Dkt. No. 103-11 at 75. Murray

continued kicking and the three men fell through the door and onto the ground. Dkt. No.

103-7 at 20. Tulip fell onto Murray in an attempt to control Murray's feet but became

"incapacitated" and rolled on the ground. Dkt. No. 103-7 at 17; see Dkt. No. 103-11 at 55,

65–66. Murray attempted to bite Arquitt, who was at that point positioned around Murray's

head and shoulder area. Dkt. No. 103-11 at 76.

Arquitt, along with defendants and Corrections Officers Bogett, Clark, and Grant, forced

Murray to the floor using body holds. Dkt. No. 103-7 at 8, 11. Arquitt held down Murray's

head with his left hand and applied pressure to Murray's left shoulder with his right hand.

Id. at 8, 11, 20. Bogett controlled Murray's waist chain with his left hand and placed his left

knee on Murray's back. Id. at 8, 11, 15. Clark bent Murray's left leg across the back side of

the right leg then bent the right leg up into a figure four leg hold. Id. at 8, 11, 17.

Hebert arrived and ordered the officers to carry Murray into the infirmary holding pen

because Murray was non-complaint. Dkt. No. 103-7 at 8, 11. Bogett grabbed Murray's shirt

with his left hand and controlled Murray's right arm with his right hand. Id. at 8, 11, 15.

Grant took control of Murray's left arm with both hands to carry him while Arquitt took

Murray's legs in his left arms. Id. at 8, 11, 20–21. Clark attended to Tulip. Id. at 17.

Hebert was in the infirmary holding pen with Murray. Dkt. No. 103-7 at 6 (misbehavior

report). Murray refused to comply with staff and attempted to bite and kick Grant. Dkt. Nos.

103-7 at 6, 8, 11, 21, 103-11 at 114. Hebert gave several direct orders to Murray but

Murray refused to comply. Dkt. No. 103-7 at 6. Hebert ordered Bogett and Grant to take

Murray to the ground and Grant pushed on Murray's upper body while Bogett held onto

Murray's legs. Dkt. Nos. 103-7 at 11, 21, 103-11 at 97. Once Murray became complaint,

Hebert ordered non-party Corrections Officer McGaw to videotape Murray in the holding pen. Dkt. Nos. 103-7 at 11, 103-11 at 106–07.

Defendants and Corrections Officers Manley and Ramsdell responded to the incident, relieved Bogett and Grant, and escorted Murray to see medical personnel. Dkt. No. 103-7 at 18–19. Murray refused to remove his clothing. Id. at 8. Medical personnel examined Murray fully-clothed, and noted discoloration at the base of Murray's neck and minor lacerations over the right clavicular area, on and above the bridge of the nose and left eye, to the mid-lower lip, above and below the left eye, and on the anterior of the left ear. Id. at 8, 12–13. Defendant and Sergeant Rowe supervised Manley and Ramsdell escorting Murray to his cell block. Id. at 14, 18–19. Photographs were taken of Murray's injuries on December 3 and 4, 2009. Dkt. Nos. 103-7 at 8, 14, 27–29, 103-10.[4]

Grant and Tulip were transported to Alice Hyde. Dkt. No. 103-7 at 8, 103-9 at 19. Tulip had an injury to the groin and Grant had swelling in the left hand. Dkt. No. 103-7 at 8. Grant and Tulip were out of work for four days. Dkt. Nos. 103-7 at 14, 103-11 at 56. Tulip considered his injury was moderate to severe. Dkt. No. 103-11 at 56. Arquitt had pain in the middle finger and remained on duty. Dkt. Nos. 103-7 at 14, 103-9 at 18.

### C. Tier III Disciplinary Hearing and Appeals

On December 4, 2009, Murray received misbehavior reports from Hebert and Tulip. Compl. ¶ 8. Hebert charged Murray with violent conduct, interference with employee, and

---

[4] Photos taken by non-party Corrections Officer Gettman on December 4, 2009 of Murray indicate that Murray had red marks on his shoulder blades and neck and cuts between his eyebrows and on his nose. Dkt. No. 103-10 at 2–13.

refusing direct orders.  Dkt. No. 103-7 at 3.  Tulip charged Murray with violent conduct, assault on staff, and interference with employee.[5]  Id.

Murray was provided with non-party Corrections Officer Fish as an inmate assistant.  Dkt. No. 103-7 at 5, 66.  Fish met Murray on December 7, 2009.  Dkt. No. 103-11 at 4.  Fish denied Murray the videotape of the holding pen area for December 4, 2009.  Dkt. No. 103-7 at 5.  Murray's witness request list included:  non-party Inmate Bonaparte; non-party Inmate Robertson; Arquitt; Clark; Grant; Hebert; Tulip; non-party Nurse Administrator Smith; and Travers.  Id.

On December 17, 2009, defendant Captain Uhler commenced a Tier III disciplinary hearing that concluded on December 30, 2009.  Dkt. Nos. 103-11 at 2, 103-12 at 88.  Uhler stated that all documents generated from the use of force incidents were provided to Murray.  Dkt. No. 103-11 at 9.  Such documents included:  unusual incident reports; use of force reports; to-and-from memoranda; log book entries; watch commander's log; and misbehavior reports.  Id.

On December 21, 2009, Murray submitted a written complaint to Uhler.  Dkt. No. 103-7 at 33–51.  Murray asserts that he received inadequate inmate assistance, was denied the opportunity to present documentary evidence, and Uhler should not have conducted the

---

[5]  The DOCCS "IGP [Inmate Grievance Program] is a three-step process that requires an inmate to:  (1) file a grievance with the IGRC [Inmate Grievance Resolution Committee]; (2) appeal to the superintendent within four working days of receiving the IGRC's written response; and (3) appeal to the CORC [Central Office Review Committee] . . . within four working days of receipt of the superintendent's written response."  Abney v. McGinnis, 380 F.3d 663, 668 (2d Cir. 2004) (internal citations omitted).  On December 6, 2009, Murray filed a grievance claiming the defendant corrections officers used excessive force against him while also failing to intervene on his behalf.  Dkt. No. 103-13 at 6.  On January 25, 2010, non-party Deputy Superintendent Otis denied Murray's grievance.  Id. at 2.  On March 10, 2010, CORC affirmed the superintendent's decision.  Id. at 1.

hearing because Uhler had issued a restraint order against Murray and conducted the investigation. Id. at 33; Murray Dep. at 77. Uhler stated that he was not involved in the investigation of the charges. Dkt. No. 103-12 at 87.

### i. Documentary Evidence

At the disciplinary hearing's inception, Murray asked for a copy of Directive # 4940, which provides that when an anticipated use of force incident occurs, a video camera would be dispatched to record the incident. Dkt. No. 103-11 at 6. Uhler explained that despite language in the Directive, the area sergeant was first obligated to secure and move Murray to an area that did not jeopardize the safety and security of the facility. Id. at 7.

Uhler explained that he would use his discretion in producing any grievances, complaints, and lawsuit correspondences that Murray had filed with respect to the assault incidents as well as medical reports of corrections personnel. Dkt. No. 103-11 at 4–6. Uhler stated there was a video recording of the area outside the infirmary but no recording of the area inside the door. Id. at 6. There was handheld camera footage of the escort to the holding pen then back to the prison block, which could be introduced. Id.

Uhler stated that the non-audio video recording of the infirmary shows a door abruptly opening with Tulip at one side of the door, bent over on his hands and knees. Dkt. No. 103-11 at 23–24. An officer assisted Tulip. Id. at 24. Four staff members tried to force Murray to the ground. Id. at 25. Uhler watched the video several times with Murray. Id.; Dkt. No. 103-12 at 73–74. Murray contends that Tulip was not in pain before coming out of that door. Dkt. No. 103-11 at 24. It is undisputed that the officers used force against Murray in the hallway but Uhler did not see anyone kicking or punching Murray. Id. at 25, 27. This

9

incident lasted approximately one minute.  Id. at 27–28.

Uhler denied Murray's videotape request of a medical exam that took place on December 4, 2009 because the videotape contained no evidence of the December 3, 2009 incidents.  Dkt. No. 103-7 at 59.

### ii. Witnesses

Uhler proceeded to allow ten witnesses to testify.  Arquitt, Grant, Hebert, and Smith testified.  Dkt. Nos. 103-11 at 71, 96, 103-12 at 5–6, 65.

Bogett testified that he was walking to the infirmary area when he witnessed Murray kicking Tulip.  Dkt. No. 103-12 at 43.  Murray was on the ground when Bogett responded and Bogett assisted in controlling Murray by holding the waist chain.  Id.  Murray was removed from the area because it was not secure.  Id. at 44.  Bogett assisted in moving Murray to the holding pen and stood him up against a wall.  Id. at 44–45.  Murray attempted to bite Grant and struggled.  Id. at 45.  Hebert ordered Bogett to take down Murray and shortly thereafter Bogett was relieved.  Id. at 45.

Bonaparte testified that before the December 3, 2009 incidents, he heard Gettman and other nurses talk to Murray, insinuating that Murray would be assaulted.  Dkt. No. 103-12 at 48–50.

Clark testified that when he responded to the scene, Murray and other officers were on the ground, Murray was kicking his feet, and an officer was lying across Murray's legs.  Dkt. No. 103-12 at 28.  Clark did not carry Murray to the holding pen.  Id. at 29.  Clark testified that Murray was removed from that area, which was considered unsecured.  Id. at 31, 35.

Ramsdell testified that he did not use force on Murray.  Dkt. No. 103-12 at 81.  When

10

Ramsdell arrived at the scene, the use of force incident was completed and he relieved the officers who held Murray.  Id. at 82.  Ramsdell did not witness the incident itself.  Id.

Nurse Travers testified that based on Murray's complaints and symptoms on December 3, 2009, she ordered an EKG for Murray.  Dkt. No. 103-11 at 39.  Travers advised Murray that the nurse at the infirmary would give him an EKG and take a full set of his vital signs. Id. at 42.  Travers did not speak with Tulip in the infirmary.  Id.  Tulip testified that he did not have a conversation with Travers in the infirmary where Travers stated, "I'd like to get a car started for this [Murray]."  Id. at 53.

Uhler denied Murray's witness request for:  (1) Laramay because he only responded to the first incident and assisted Tulip, was not present during the use of force incident, and did not give any orders to staff; (2) Manley because he was not present at either incident and was only directed to escort Murray following the incidents; (3) Dr. Weissman because she had retired, attempts to contact her were futile, and she was not present during the incidents; (4) Robertson because he was on parole and stated that he did not want to testify; (5) non-party Inmate Gillard because he was contacted and declined to testify.[6]  Dkt. Nos. 103-7 at 12, 14, 56–58, 103-12 at 58, 62–64.  Uhler indicated he would allow Murray's request to question Rowe; however, Rowe was not produced.  Dkt. No. 103-12 at 61–62.

### iii.  Warnings

At the disciplinary hearing's inception, Murray asked to call his lawyer as a witness and Uhler denied that request, warning that "[o]utbursts and continued outbursts by yourself are

---

[6]  Uhler stated that he would conduct a secondary inquiry into the reason behind Gillard's refusal.  Dkt. No. 103-11 at 14.

going to result in me giving you a final warning and the next step will be I will remove you from this hearing." Dkt. No. 103-11 at 7–8. However, Uhler stated that his intent was not to remove Murray from the hearing. Id. at 8.

At one point, because Murray was having difficulty asking cogent questions, Uhler offered Murray additional time to formulate questions. Dkt. No. 103-11 at 68. Uhler explained that Murray "needed to prepare a defense" as Murray was "badgering" witnesses. Id. However, Murray declined the offer. Id. at 69–70. At another point, Uhler stated,

> I warned you on all three days that, do not state policy that's not true. And you expect me to ask the witness about a policy that doesn't exist. I'm not going to discredit staff, and belittle staff based on some makeup believe policy that you believe exists when I ruled on it already telling you it doesn't exist.

Dkt. No. 103-12 at 39.

During the inception of Bogett's testimony, Uhler ejected Murray, stating, "I am not going to continue you to stare down and try to intimate the witnesses of this hearing. I've explained this to you in detail, in detail, alright? So I'll have you removed from this hearing at this time." Dkt. No. 103-12 at 40. After Bogett's testimony, Uhler spoke with Murray and returned Murray to the hearing. Id. at 46.

### iv. Disposition and Appeals

On December 30, 2009, Uhler issued a hearing disposition. Dkt. No. 103-7 at 4. Uhler relied on: reports written by Hebert and Tulip; review of two unusual incident reports; testimony from eight staff members and one inmate; and a video tape of the infirmary door area showing staff tackling Murray to the floor. Id. Uhler concluded that all staff testimony was consistent with each other and the video evidence. Id. Uhler considered Tulip's

12

testimony that he had moderate to serious injuries from Murray's kicking and was out of work for four days per a doctor's order.  Id. at 4, 14.  Grant was out of work for four days as well.  Id. at 14.  Travers and Smith testified that care given was appropriate.  Id. at 4. Further, Uhler considered testimonies that Murray had attacked staff.  Id.  Uhler wrote, "[t]his type of behavior will not be allowed.  Inmate caused serious harm to staff and placed many others in grave danger."  Id.  A copy of the disposition was given to Murray.  Id.  Uhler ordered that Murray be placed in the Special Housing Unit ("SHU")[7] for sixty months. Compl. ¶ 9; Dkt. Nos. 103-7 at 3, 103-12 at 90–91.  Uhler also gave Murray sixty months loss of privileges for packages, commissary, phone, and good time credits.  Dkt. Nos. 103-7 at 3, 103-12 at 90–91.

On March 8, 2010, defendant Director of SHU/Inmate Discipline Bezio modified Murray's sentence to twenty-four months in SHU, to begin on June 28, 2014.  Dkt. No. 103-6 at 2–3; Murray Dep. at 12.[8]  By letter dated June 3, 2010, Murray's attorney at Prisoners' Legal Services sought reconsideration of the disciplinary hearing disposition.  Dkt. No. 103-14 at 9–12.  By letter dated August 18, 2010, defendant Acting Director of SHU/Inmate Disciplinary Programs Prack denied reconsideration.  Id. at 13.

As of February 17, 2012, Murray has approximately seventeen years of prison time left to serve in SHU from other misbehavior reports.  Murray Dep. at 11.  Murray alleges that

---

[7]    SHUs exist in all maximum and certain medium security facilities.  The units "consist of single-occupancy cells grouped so as to provide separation from the general population . . . ."  N.Y. COMP. CODES R. & REGS. tit 7, § 300.2(b).  Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required.  Id. at pt. 301.

[8]    Defendant Bezio also reduced the punishment to twenty-four months of other privileges and good time credits to begin on April 22, 2011.  Dkt. No. 103-6 at 2–3.

SHU confinement causes him mental distress.  Compl. ¶ 15; Murray Dep. at 76.  Murray does not seek reinstatement of good time credits.  Compl. ¶ 16.

## II.  Discussion

Murray alleges that his Eighth Amendment rights were violated when:  (1) defendants Arquitt, Bogett, Clark, Grant, Hebert, Laramay, Manley, McGaw, Ramsdell, Rowe, and Tulip either used excessive force against him and failed to intervene on his behalf; (2) defendants Bezio and Prack exhibited deliberate indifference to his safety in denying his appeals; and (3) defendants Fischer and Rock exhibited deliberate indifference in failing to train subordinates.  Compl. ¶¶ 2–7, at 27.  Murray further alleges that his Fourteenth Amendment rights were violated when:  (1) defendants Hebert and Tulip issued false misbehavior reports against him; (2) defendants Bezio, Prack, and Rock denied his appeals and failed to remedy the alleged constitutional violations; and (3) defendant Uhler failed to provide him with due process.  Id. ¶¶ 8–13, 17, at 27.  Murray seeks monetary damages and injunctive and declaratory relief.  Id. at 28.

Defendants seek summary judgment of certain claims, contending that Murray's:  (1) claims against them in their official capacities for monetary damages are barred by the Eleventh Amendment; (2) Eighth Amendment claims against Ramsdell and Fourteenth Amendment claims against defendants Fischer, Prack, and Rock must fail because they were not personally involved in the alleged constitutional violations; (3) Fourteenth Amendment procedural due process claim against defendants Bezio, Fischer, Prack, Rock, and Uhler must fail because Murray received all process that was due; (4) Fourteenth Amendment claims against defendants Hebert and Tulip based on the filing of false

14

misbehavior reports must fail; and (5) defendants Bezio, Fischer, Prack, Rock, and Uhler are entitled to qualified immunity.  Defs.' Mem. of Law (Dkt. No. 103-16) at 4–5.

## A.  Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law.  The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion.  FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Facts are material if they may affect the outcome of the case as determined by substantive law.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party.  Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial.  The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment.  Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223–24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude.  See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006).  As the Second Circuit has stated,

> [t]here are many cases in which we have said that a <u>pro se</u>
> litigant is entitled to "special solicitude," . . . that a <u>pro se</u> litigant's
> submissions must be construed "liberally,". . . and that such
> submissions must be read to raise the strongest arguments that
> they "suggest," . . . .  At the same time, our cases have also
> indicated that we cannot read into <u>pro se</u> submissions claims
> that are not "consistent" with the <u>pro se</u> litigant's allegations, . . .
> or arguments that the submissions themselves do not "suggest,"
> . . . that we should not "excuse frivolous or vexatious filings by
> <u>pro se</u> litigants," . . . and that <u>pro se</u> status "does not exempt a
> party from compliance with relevant rules of procedural and
> substantive law . . . ."

<u>Id.</u> (citations and footnote omitted); <u>see also</u> <u>Sealed Plaintiff v. Sealed Defendant #1</u>, 537
F.3d 185, 191–92 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded
district courts that 'when [a] plaintiff proceeds <u>pro se</u>, . . . a court is obliged to construe his
pleadings liberally.'" (citations omitted)).  However, the mere existence of some alleged
factual dispute between the parties will not defeat an otherwise properly supported motion;
the requirement is that there be no genuine issue of material fact.  <u>Anderson</u>, 477 U.S. at
247–48.

## B.  Eleventh Amendment

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall
not be construed to extend to any suit in law or equity, commenced or prosecuted against
one of the United States by Citizens of another State, or by Citizens or Subjects of any
Foreign State."  U.S. CONST. amend. XI.  "[D]espite the limited terms of the Eleventh
Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her]
own State."  <u>Pennhurst State Sch. & Hosp. v. Halderman</u>, 465 U.S. 89, 98 (1984) (citing
<u>Hans v. Louisiana</u>, 134 U.S. 1, 21 (1890)).  Regardless of the nature of the relief sought, in

16

the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment.  <u>Halderman</u>, 465 U.S. at 100.  Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states.  <u>See</u> <u>Quern v. Jordan</u>, 440 U.S. 332, 340–41 (1979).

A suit against a state official in his or her official capacity is a suit against the entity that employs the official.  <u>Farid v. Smith</u>, 850 F.2d 917, 921 (2d Cir. 1988) (<u>citing</u> <u>Edelman v. Jordan</u>, 415 U.S. 651, 663 (1974)).  "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer.  <u>Kentucky v. Graham</u>, 473 U.S. 159, 166 (1985).  Here, because Murray seeks monetary damages against defendants for acts occurring within the scope of their duties, the Eleventh Amendment bar applies and serves to prohibit claims for monetary damages against them in their official capacity.

Accordingly, defendants' motion on this ground should be granted.


### C.  Personal Involvement

"'[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'"  <u>Wright v. Smith</u>, 21 F.3d 496, 501 (2d Cir. 1994) (quoting <u>Moffitt v. Town of Brookfield</u>, 950 F.2d 880, 885 (2d Cir. 1991)).  Thus, supervisory officials may not be held liable merely because they held a position of authority.  <u>Id.</u>; <u>Black v. Coughlin</u>, 76 F.3d 72, 74 (2d Cir. 1996).  However, supervisory personnel may be considered "personally involved" if:

> (1) [T]he defendant participated directly in the alleged
> constitutional violation;
>
> (2) the defendant, after being informed of the violation through a
> report or appeal, failed to remedy the wrong;
>
> (3) the defendant created a policy or custom under which
> unconstitutional practices occurred, or allowed the continuance
> of such a policy or custom;
>
> (4) the defendant was grossly negligent in supervising
> subordinates who committed the wrongful acts; or
>
> (5) the defendant exhibited deliberate indifference to the rights of
> inmates by failing to act on information indicating that
> unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986)).[9]

### 1. Ramsdell

Murray has failed to establish the personal involvement of Ramsdell for the claims of excessive force and failure to protect. Murray believes that Ramsdell was present and assaulted him during the second incident on December 3, 2009 but does not know if Ramsdell had struck him. Contrary to Murray's assertion, Ramsdell testified that his involvement did not commence until he arrived at the scene after Bogett and Grant used

---

[9] Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision affected the five Colon factors which were traditionally used to determine personal involvement. Pearce v. Estate of Longo, 766 F. Supp. 2d 367, 376 (N.D.N.Y. 2011), rev'd in part on other grounds sub nom., Pearce v. Labella, 473 F. App'x 16 (2d Cir. 2012) (recognizing that several district courts in the Second Circuit have debated Iqbal's impact on the five Colon factors); Kleehammer v. Monroe Cnty., 743 F. Supp. 2d 175 (W.D.N.Y. 2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster . . . ."); D'Olimpio v. Crisafi, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010) (disagreeing that Iqbal eliminated Colon's personal involvement standard).

force on Murray.  Further, Ramsdell only escorted Murray to seek medical attention.

Ramsdell's version of the events is consistent with use of force reports, unusual incident

reports, and internal memoranda.  See Dkt. Nos. 103-7 at 14, 18–19, 103-8, 103-9 at 1–5.

While "an [inmate']s 'inability to positively identify those who allegedly violated his rights

is not per se fatal to his claims" Murray does not point to any record evidence establishing

that Ramsdell was at scene of Murray's assault either before or during the time of the

alleged use of excessive force.  De Michele v. City of New York, No. 09-CV-9334 (PGG),

2012 WL 4354763, at *16 (S.D.N.Y. Sept. 24, 2012) (citations omitted).[10]  Despite Murray's

conclusory and speculative assertions, it is fair to conclude that a rational factfinder could

not find in favor of Murray as the record is devoid of any evidence indicating that Ramsdell

was present at either assault.  See, e.g., Coleman v. Hauck, No. 09-CV-1391 (GTS)(GHL),

2012 WL 4480684, at *9 (N.D.N.Y. Sept. 26, 2012) (granting summary judgment for certain

defendants on personal involvement grounds where plaintiff argued that "[a]ll named

Defendants responded to the scene where Plaintiff was repeatedly struck and kicked in the

face" but failed to point to record evidence establishing that those defendants arrived at the

scene before the use of force was applied).

Furthermore, Murray failed to proffer any evidence showing that Ramsdell had "a

realistic opportunity to intervene to prevent the harm from occurring."  De Michele, 2012 WL

4354763, at *17 (citing inter alia Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994))

(internal quotation marks omitted).  As Murray does not provide even a scintilla of evidence

that Ramsdell was present at the time of the alleged assaults, Murray cannot show that

---

[10]  All unpublished opinions cited to by the Court in this Report-Recommendation
are, unless otherwise noted, attached to this Recommendation.

19

Ramsdell had directly participated in the assaults or failed to intervene in the misconduct. Moreover, Murray does not allege, and the record does not reflect the contrary, that Ramsdell had created a policy or custom under which unconstitutional practices occurred or was grossly negligent in his supervision. Colon, 58 F.3d at 873. Therefore, Murray cannot establish the personal involvement of Ramsdell in the alleged unconstitutional actions.

Accordingly, defendants' motion on this ground should be granted.


### 2.  Fischer

Murray claims that Commissioner Fischer was negligent in managing his subordinates. The gravamen of Fischer's complaints against Fischer is that he was in a position of power, thus always involved with anything occurring in conjunction with Murray's incarceration. However, attempts to establish personal involvement based upon the supervisory role this defendant occupied is inappropriate. Wright, 21 F.3d at 501 (holding that a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement).

Drawing every favorable inference in Murray's favor, Murray contends that he notified Fischer of the alleged constitutional violations through letters and grievances. However, merely writing letters and grievances to a defendant is insufficient to establish notice and personal involvement. Smart v. Goord, 441 F. Supp. 2d 631, 643 (S.D.N.Y. 2006) ("Commissioner . . . cannot be held liable on the sole basis that he did not act in response to letters of protest sent by [plaintiff] . . . ."). Similarly, receipt of a letter or grievance, without personally investigating or acting on the letter or grievance, is insufficient to establish personal involvement. See, e.g., Rivera v. Fischer, 655 F. Supp. 2d 235, 238

(W.D.N.Y.2009) (citing cases); <u>Boddie v. Morgenthau</u>, 342 F. Supp. 2d 193, 203 (S.D.N.Y. 2004) ("While mere receipt of a letter from a prisoner is insufficient to establish individual liability . . . [p]ersonal involvement will be found . . . where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint.").

The only correspondence which referenced any involvement by Fischer was a letter addressed to Fischer from Murray for an extension to appeal the Tier III hearing disposition. Dkt. No. 103-14 at 4–5. A letter from Bezio explained to Murray that the letter was received and Murray's letter request satisfied the thirty-day time period for submitting an appeal. <u>Id.</u> at 3. Here, it is within the purview of a superior officer to delegate responsibility to others. <u>See</u> <u>Vega v. Artus</u>, 610 F. Supp. 2d 185, 198 (N.D.N.Y.2009) (finding no personal involvement where "the only involvement of the supervisory official was to refer the inmate's complaint to the appropriate staff for investigation.") (citing <u>Ortiz-Rodriguez v. N.Y. State Dep't of Corr. Servs.</u>, 491 F. Supp. 2d 342, 347 (W.D.N.Y. 2007)). Moreover, conclusory allegations about negligent supervision and a failure to train are insufficient to establish personal involvement.

Accordingly, defendants' motion on this ground should be granted.

### 3. Prack

Murray claims that Prack violated his Fourteenth Amendment rights by denying his appeals and failing to remedy the alleged constitutional violations. The only correspondence referencing Prack's involvement is a letter denying reconsideration of Bezio's reduced penalty for the disciplinary hearing. The affirmation of an allegedly

unconstitutional disciplinary hearing appears to establish personal involvement. See Thomas v. Calero, 824 F. Supp. 2d 488, 505–11 (S.D.N.Y. 2011) (discussing cases and concluding that affirming or modifying, as opposed to vacating and remedying, an allegedly constitutionally infirm disciplinary proceeding can satisfy various prongs of Colon and, regardless of Iqbal's impact on the Colon factors, results in a constitutional violation of which the defendant had knowledge, failed to remedy, and allowed to continue). However, as discussed infra, Murray's disciplinary hearing passes constitutional muster. As such, Murray cannot establish Fourteenth Amendment due process claims against Prack based on the affirmance of a constitutional disciplinary hearing.

Accordingly, defendants' motion on this ground should be granted.

### 4. Rock

Lastly, Murray contends that Superintendent Rock violated his Fourteenth Amendment by denying his appeals, failing to remedy the alleged constitutional violations, and failing to train subordinates. The record is devoid of any reference to Rock's personal involvement. Before the Court is a superintendent decision dated January 25, 2010 that denied Murray's grievance. Nevertheless, that decision was signed by Deputy Superintendent Otis, not Superintendent Rock. As previously discussed, it is within the purview of a superior officer to delegate responsibility to others. See Vega, 610 F. Supp. 2d at 198 (citation omitted). As such, Murray has failed to establish Rock's personal involvement in the alleged due process violations. Colon, 58 F.3d at 873.

Accordingly, defendants' motion on this ground should be granted.

### D. Fourteenth Amendment

The Due Process Clause of the Fourteenth Amendment states that "[n]o State shall . . . deprive any person of life, liberty, or property without due process of law." U.S. CONST. amend. XIV § 1.  It is important to emphasize that due process "does not protect against all deprivations of liberty.  It protects only against deprivations of liberty accomplished without due process of the law." Baker v. McCollan, 443 U.S. 137, 145 (1979) (internal quotation and citations omitted).  "A liberty interest may arise from the Constitution itself, . . . or it may arise from an expectation or interest created by state laws or policies." Wilkinson v. Austin, 545 U.S. 209, 221 (2005) (citations omitted).  An inmate retains a protected liberty interest to remain free from segregated confinement if the prisoner can satisfy the standard set forth in Sandin v. Conner, 515 U.S. 472, 483–84 (1995).

### 1. Procedural Due Process

To state a claim for procedural due process, there must first be a liberty interest which requires protection.  See generally Valmonte v. Bane, 18 F.3d 992, 998 (2d Cir. 1994) ("[P]rocedural due process questions [are analyzed] in two steps:  the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.") (citing Kentucky Dep't of Corr. v. Thompson, 490 U.S. 454, 460 (1989)).  The Second Circuit has articulated a two-part test whereby the length of time a prisoner was placed in segregation as well as "the conditions of the prisoner's segregated confinement relative to the conditions of the general prison population" are to be considered.  Vasquez v. Coughlin, 2 F. Supp. 2d 255, 259 (N.D.N.Y. 1998).  This standard

requires a prisoner to establish that the confinement or condition was atypical and significant in relation to ordinary prison life.  See Jenkins v. Haubert, 179 F.3d 19, 28 (2d Cir.1999); Frazier v. Coughlin, 81 F.3d 313, 317 (2d Cir.1996).

While not a dispositive factor, the duration of a disciplinary confinement is a significant factor in determining atypicality.  Colon v. Howard, 215 F.3d 227, 231 (2d Cir. 2000) (citations omitted).  The Second Circuit has not established "a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights."  Palmer v. Richards, 364 F.3d 60, 64 (2d Cir. 2004) (citations omitted).  Instead, the Second Circuit has provided guidelines that "[w]here the plaintiff was confined for an intermediate duration—between 101 and 305 days—development of a detailed record of the conditions of confinement relative to ordinary prison conditions is required."  Id. at 64–65 (citing Colon, 215 F.3d at 232).  In the absence of a dispute about the conditions of confinement, summary judgment may be issued "as a matter of law."  Id. at 65 (citations omitted).  Conversely, where an inmate is confined under normal SHU conditions for a duration in excess of an intermediate disposition, the length of the confinement itself is sufficient to establish atypicality.  Id. (citing Colon, 215 F.3d at 231–32).  Also, "[i]n the absence of a detailed factual record, cases in this Circuit typically affirm dismissal of due process claims where the period of time spent in SHU was short—e.g. 30 days—and there was no indication [of] . . . unusual conditions."  Harvey v. Harder, No. 09-CV-154 (TJM/ATB), 2012 WL 4093792, at *6 (N.D.N.Y. July 31, 2012) (citing inter alia Palmer, 364 F.3d at 65–66).

Defendants contend that Murray has failed to show the deprivation of a liberty interest because he has yet to serve the assigned SHU time.  Courts in this District have held that where the plaintiff had not yet served the sentence imposed at the time he filed his

24

complaint, the Court is unable to determine whether the confinement conditions of SHU were atypical or significant.  See, e.g., Chavis v. Kienert, No. 03-CV-0039 (FJS/RFT), 2005 WL 2452150, at *12 (N.D.N.Y. Sept. 30, 2005).  However, Murray was sentenced to twenty-four months of SHU confinement, which amounts to 730 days.  This length of confinement is sufficient to establish atypicality.  Palmer, 364 F.3d at 64.  Even though Murray has yet to serve the penalty, he is scheduled to serve it on June 28, 2014, and there is no evidence before the Court indicating otherwise.  Given the length of the sentence and the imminent date for commencement of that sentence, the Court is not persuaded that Murray has failed to establish a liberty interest for purposes of his procedural due process claims.  Cf. Benitez v. Mailloux, No. 05-CV-1160, 2009 WL 1953847, at *10–11 (N.D.N.Y. Mar. 25, 2005), report and recommendation adopted in part, rejected in part on other grounds, No. 05-CV-1160 (NAM/RFT), 2009 WL 1953752 (N.D.N.Y. July 2, 2009) (concluding no liberty interest in 2009 when sentence was to be served in 2012).  As such, the Court proceeds with the understanding that Murray has in fact established a liberty interest.

Defendants alternatively argue that Murray's procedural due process claims against defendants Bezio, Fischer, Prack, Rock, and Uhler should be dismissed because Murray was given all process that was due.  While inmates are not given "the full panoply of [due process] rights," they are still afforded procedural process.  Wolff v. McDonnell, 418 U.S. 539, 556 (1974).  A prisoner is "entitled to advance written notice . . . ; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition including the evidence relied upon and the reasons for the disciplinary actions taken."  Sira v. Morton, 380 F.3d 57, 69 (2d Cir. 2004) (citations omitted).

### a. Written Notice

In this case, the issue of a written notice is undisputed.  An inmate must be provided advance written notice at least twenty-four hours before the hearing commences.  Wolff, 418 U.S. at 563–64.  Murray was provided with a written notice of the Tier III disciplinary hearing.  On December 4, 2009, Murray received the misbehavior reports authored by Hebert and Tulip.  Those reports charged Murray with violent conduct, interference with employee, and refusing direct order, and assault on staff for the December 3, 2009 incidents.  The disciplinary hearing commenced on December 17, 2009.  As such, Murray was provided with written advance notice.  Sira, 380 F.3d at 69.

### b. Opportunity to Call Witnesses and Present Documentary Evidence

Murray contends that he was deprived of an opportunity to call all witnesses and present certain documentary evidence.  However, "[i]t is well settled that an official may refuse to call witnesses as long as the refusal is justifiable [such as] . . . on the basis of irrelevance or lack of necessity."  Scott v. Kelly, 962 F.2d 145, 146–47 (2d Cir. 1992) (internal quotations and citations omitted).  Uhler permitted ten individuals to testify at Murray's disciplinary hearing.  Gillard and Robertson did not testify because they declined to do so and Murray has not alleged, and the record does not reflect the contrary, that intimidation by prison officials resulted in the witnesses' refusals.  Webb v. Selsky, No. 01-CV-149S, 2008 WL 796179, at *6 (W.D.N.Y. Mar. 24, 2008) ("A failure to summon the testimony of a witness who has refused to testify, in the absence of evidence that the refusal was linked to intimidation on the part of prison officials, does not violate due process because calling a witness who refuses to speak upon questioning would be futile.") (citing Johnson v. Doling,

No. 05-CV-376 (TJM/RFT), 2007 WL 3046701, at *7 (N.D.N.Y. Oct.17, 2007)).  There is nothing in the record indicating that either Gillard or Robertson would have provided evidence favorable to Murray beyond what was given by Bonaparte.  Livingston v. Kelly, 423 F. App'x 37, 40 (2d Cir. 2011) (citation omitted).  Furthermore, while Laramay, Manley, Weissman, and Rowe did not testify, they did not observe what transpired during the use of force incidents on December 3, 2009.  Thus, their testimonies would not assist Uhler in arriving at a decision regarding the appropriateness of the misbehavior reports.

The same is true for the evidence which was denied.  Uhler denied Murray's request to watch footage of Murray on December 4, 2009 because it was irrelevant to the events on December 3, 2009.  Further, Murray was provided all documents generated from the use of force incidents as well as review of a video recording showing what occurred after Arquitt, Murray, and Tulip fell through the door.  Moreover, Uhler ultimately granted Murray the opportunity to watch handheld footage of his escort from the examination room to his cell. "Courts have long recognized . . . that the right to know evidence supporting prison disciplinary rulings is not absolute."  Sira, 380 F.3d at 74 (citations omitted).  Accordingly, in light of all documentary evidence that was provided to Murray, discovery of irrelevant documents regarding medical records and video surveillance would be of no value in determining the validity of the disciplinary tickets.

Murray was provided with an opportunity to extensively question his witnesses through Uhler.  "While inmate do have the right to question witnesses at their disciplinary hearings, that right is not unlimited and its contours are under the discretion of prison officials."  Rivera v. Wohlrab, 232 F. Supp. 2d 117, 125 (S.D.N.Y. 2002).  Thus, Uhler retained the authority and discretion to administer the questioning in a manner he saw fit.  While Uhler

did not permit Murray to ask every question, a review of the hearing transcript shows that he did permit Murray to question the witnesses rather extensively.  Moreover, when Uhler denied Murray's questions he provided reasoning regarding the denial, such as the lack of relevance to the ultimate issue of the validity of the misbehavior report.

Accordingly, Murray was provided with an opportunity to call witnesses and present documentary evidence.  Sira, 380 F.3d at 69.


### c. Fair and Impartial Hearing Officer

Murray contends that Ulher was not an impartial hearing officer because Uhler had personally investigated the matter, already decided on the credibility of witnesses, and ejected Murray from the hearing during Bogett's testimony.  Prisoners have a constitutional right to a fair and impartial hearing officer.  See, e.g., Sira v. Morton, 380 F.3d 57, 69 (2d Cir. 2004).  However, "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges . . .  [as i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts."  Allen v. Cuomo, 100 F.3d 253, 259 (2d Cir. 1996) (citations omitted).   The Supreme Court held "that the requirements of due process are satisfied if some evidence supports the decision by the [hearing officer] . . " and the Second Circuit has held that the test is whether there was "'reliable evidence' of the inmate's guilt."  Luna v. Pico, 356 F.3d 481, 487–88 (2d Cir. 2004); see also Superintendent, Mass. Corr. Inst. v. Hill, 472 U.S. 445, 455 (1985).

It was clear that Uhler was objective and carefully listened to the testimony and arguments presented by Murray as Uhler reversed his prior decision about allowing

Bonaparte to testify as well as offering Murray an opportunity to adjourn the hearing so that Murray may formulate more cogent questions to support and present his defense. Throughout the hearing, Uhler reiterated that he had yet to determine whether Murray was guilty of the prison violations charged.  See, e.g., Dkt. No. 103-12 at 83.  Moreover, Uhler offered to make personal inquiries as to certain witnesses to confirm their intention to decline appearing at the disciplinary hearing.

Murray specifically claims that Uhler had stated Traver's credibility was not at issue. However, this assertion is misplaced.  In context, Uhler stated, "[h]er credibility is not on[,] here's the problem[,] it is my job to determine the credibility of any witness whether it is employee or inmate is good or bad at this hearing." Dkt. No. 103-11 at 45.  Uhler continued, explaining that in order to show a witness was providing false allegations, Murray should submit evidence to substantiate his position.  Id. at 49.

Murray asserts that Uhler should not have conducted the hearing because Uhler had investigated the charges against him and issued a restraint order for Murray after the alleged assault on staff.  These conclusory assertions remain unsubstantiated.  Uhler stated that he did not investigate the incidents.  In fact, Uhler further explained,

> you've stated that you were assaulted[.]  I can tell you as the Dep. of Security at this facility[,] I am aware of those complaints prior to coming down here today to do this hearing.  I am aware that you have made allegations of abuse.  I have not been part of the investigation that is being done by someone else at this point . . . and that's outside of this hearing room.

Dkt. No. 103-11 at 35.  Moreover, Uhler explained that he had only signed a recommendation from a sergeant, which was recommended by the watch commander for full restraints based on allegations against Murray.  Dkt. No. 1-3-12 at 87.  There is no

record evidence showing the contrary; thus, Murray's contention on this point is unsubstantiated and without merit.

Murray also asserts that Uhler violated his due process rights when Uhler removed him from the hearing during Bogett's testimony. However, "inmates do not possess a constitutional right to be present during the testimony of witnesses during a disciplinary proceeding." Harmon v. Escrow, No. 08-CV-6381 (CJS), 2012 WL 3560812, at *4 (W.D.N.Y. Aug. 16, 2012) (citing Francis v. Coughlin, 891 F.2d 43, 48 (2d Cir. 1989), Hidalgo v. Hopin, No. 01-CV-0057(Sr), 2009 WL 4803689 (W.D.N.Y. Dec. 9, 2009) (stating inmates do not have "a constitutional right to confront or cross-examine witnesses in prison disciplinary hearings)). As such, Murray's due process rights were not violated when Uhler took Bogett's testimony in Murray's absence.

Lastly, it is clear that Murray's disciplinary disposition was based on reliable evidence of his guilt. Arquitt and Tulip testified that they were escorting Murray from the infirmary when Murray turned around and kicked Tulip in the groin area. In response, Arquitt and Tulip tackled Murray to the ground and in doing so, fell through a door. Tulip denied having hit Murray in the head prior to being kicked. Hebert testified that after Murray was placed in the holding pen, Murray continued to struggle with Bogett and attempted to bite Grant. Clark was working in the infirmary and responded a loud noise in the entrance where he found Murray on the ground with officers attempting to restrain him. Clark assisted Tulip, who appeared injured. These officers' testimonies are consistent with each others' account of the events, a video tape of the infirmary's entrance way, and are supported by internal memoranda and the use of force and usual incident reports. As for Bonaparte's testimony regarding Travers and other prison staff, these individuals are not parties to this action.

Uhler carefully considered the competing evidence, namely the testimonies, reports, video recording, and injuries suffered by Tulip and Grant, with Murray's contention that he did not provoke the use of force incidents. Ultimately, Uhler reasoned that Murray's behavior caused harm to staff, and given the environment of prisons, such behavior should and would not be tolerated.

Accordingly, despite Murray's conclusory and unsupported contentions of bias, the record is clear that there is no question of material fact surrounding the process Murray was provided. As such, defendants' motion should be granted on this ground.

### d. Written Statement of Disposition

It is undisputed that Murray received a written statement of the hearing disposition. On December 30, 2009, Murray voluntarily left his disciplinary hearing before Uhler rendered his decision on the two misbehavior reports. Dkt. No. 103-12 at 88–89. The record indicates that Murray received a written statement of the evidence relied upon and reasons for the disciplinary action. Thus, Murray was provided with a written statement of the Tier III disciplinary hearing disposition. Sira, 380 F.3d at 69.

Accordingly, defendants' motion on this ground should be granted.

### e. Inmate Assistance

"An inmate's right to assistance with his disciplinary hearing is limited." Neree v. O'Hara, No. 09-CV-802 (MAD/ATB), 2011 WL 3841551, at *13 (N.D.N.Y. July 20, 2011) (Silva v. Casey, 992 F.2d 20, 22 (2d Cir. 1993)). This Circuit has held that an assistant is constitutionally necessary when the plaintiff is confined in SHU and unable to marshal

evidence and present a defense.  Id. (citation omitted).  In such a case, the assistant need

only perform what the plaintiff would have done but need not go beyond the inmate's

instructions.  Lewis v. Johnson, No. 08-CV-482 (TJM/ATB), 2010 WL 3785771, at *10

(N.D.N.Y. Aug. 5. 2010) (citing Silva, 992 F.2d at 22).  Furthermore, "any violations of this

qualified right are reviewed for 'harmless error.'"  Clyde v. Schoellkopf, 714 F. Supp. 2d

432, 437 (W.D.N.Y. 2010) (citing Pilgrim v. Luther, 571 F.3d 201, 206 (2d Cir. 2009)).

Here, Murray was confined in SHU from December 3, 2009 onward and thus is entitled

to an inmate assistant.  Dkt. No. 103-5 at 3; see also Murray v. Goord, 668 F. Supp. 2d

344, 350 (N.D.N.Y. 2009) ("Upstate . . . [is] a maximum security prison comprised of special

housing unit ("SHU") cells in which inmates are confined . . . .") (citation omitted).  Murray

alleges that he was generally deprived of adequate inmate assistance.  Murray first met with

his Inmate Assistant Fish on December 7, 2009.  Fish assisted Murray with completing the

assistant form to identify witnesses and documentary evidence.  Fish also assisted Murray

with contacting potential witnesses to testify at the disciplinary hearing.  Dkt. No. 103-11 at

5, 14.  Fish denied Murray any complaints or legal correspondence with respect to Murray

being assaulted in the infirmary area.  Dkt. No. 103-11 at 5.  However, Uhler stated at the

disciplinary hearing that he may produce such records if during the hearing, he determines

that those records are relevant.  Id.  As for video footage of what occurred on December 3,

2009 inside the door, Uhler explained that such footage did not exist.  Id.  Further, Uhler

denied Murray video footage of him on December 4, 2009 because it was irrelevant to the

December 3, 2009 incidents.

Even assuming Fish had provided inadequate assistance, such a deprivation was

rendered harmless and a factfinder could not conclude that Murray was prejudiced as a

32

result.  <u>Gallo</u>, 22 F.3d at 1223–24.  The record shows that Uhler took steps to provide Murray with the requested evidence.  Uhler also offered Murray more time to prepare for the hearing, which Murray declined.  There is no indication that the result of Murray's hearing would be different had Fish provided Murray with all requested evidence.  <u>See</u> <u>Chavis v. vonHagn</u>, No. 02-CV-0119 (Sr), 2009 WL 236060, at *53 (W.D.N.Y. Jan. 30, 2009) (finding due process claim based on denied employee assistant to prepare for disciplinary hearings was without merit because the record showed that "plaintiff was indeed able to present evidence (and often did), both oral and documentary, in his own defense) (citation omitted).  As such, Murray's due process claim based on inmate assistance must fail.

Accordingly, defendants' motion on this ground should be granted.


## 2.  False Misbehavior Report

An inmate has a right not to be deprived of a liberty interest without due process.  However, a "prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest."  <u>Freeman v. Rideout</u>, 808 F.2d 949, 951 (2d Cir. 1986)).  "There must be more, such as retaliation against the prisoner for exercising a constitutional right."  <u>Boddie v. Schnieder</u>, 105 F.3d 857, 862 (2d Cir.1997) (citing <u>Franco v. Kelly</u>, 854 F.2d 584, 588–90 (2d Cir. 1988)).  Even so, a due process claim predicated upon a false misbehavior report issued in retaliation against an inmate still fails to state a claim if the inmate received all the procedural process protections that was due to him.  <u>Livingston</u>, 423 F. App'x at 40 (citing <u>inter alia</u> <u>Freeman</u>, 808 F.2d at 952).  Here, Murray alleges that defendants Hebert and Tulip filed false misbehavior reports against him in retaliation for Murray lodging grievances

and complaints.  <u>Boddie</u>, 105 F.3d at 862; <u>see</u> Murray Dep. 38–39.  However, as discussed above, Murray received all the procedural process protections that he was due.

Moreover, to allege a claim based on the issuance of false misbehavior reports as retaliatory conduct, a prisoner must establish by a preponderance of the evidence that:  (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action.  <u>Gill v. Pidlypchak</u>, 389 F.3d 379, 380 (2d Cir. 2004) (internal quotation marks and citation omitted); <u>Tafari v. McCarthy</u>, 714 F. Supp. 2d 317, 347 (N.D.N.Y. 2010).  Murray does not allege any facts going to establishing a causal connection.  Murray does not proffer any information with regard to grievances or complaints he filed against either Hebert or Tulip.  Murray further testified that he believes Tulip retaliated against him because he insulted Tulip.  Murray Dep. at 41.  However, such insults do not constitute protected speech.  <u>Doe v. Selsky</u>, No. 08-CV-6199L, 2013 WL 5311221, at *3 (W.D.N.Y. Sept. 20, 2013) (citing <u>Lockett v. Suardini</u>, 526 F.3d 866, 874 (6th Cir. 2008) (finding inmate's insulting comments to a disciplinary hearing officer was not protected speech), <u>Chevalier v. Schmidt</u>, No. 11-CV-788(JTC), 2012 WL 6690313, at *3 (W.D.N.Y. Dec. 21, 2012) ("Vulgar, insulting, and threatening statements have been found not to be protected speech for purposes of the First Amendment")).  As such, Murray has failed to allege a due process claim based on the issuance of false misbehavior reports as retaliatory conduct.

Accordingly, defendants' motion on this ground should be granted.

## E. Qualified Immunity

Defendants Bezio, Fischer, Prack, Rock, and Uhler contend that even if Murray's Fourteenth Amendment claims are substantiated, they are nevertheless entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Aiken v. Nixon, 236 F. Supp. 2d 211, 229–30 (N.D.N.Y. 2002) (McAvoy, J.), aff'd, 80 F. App'x 146 (2d Cir. 2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified . . . immunity might still be available . . . if it was objectively reasonable for the public official to believe that his acts did not violate those rights." Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted)). A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. Saucier v. Katz, 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. Aiken, 236 F. Supp. 2d at 230. Here, the second prong of the inquiry need not be addressed with respect to Murray's Fourteenth Amendment claims against these defendants because, as discussed supra, it has not been shown that defendants violated Murray's Fourteenth Amendment rights.

Accordingly, defendants' motion on this ground should be granted.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for partial summary judgment (Dkt. No. 103) is **GRANTED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the . . . recommendation." N.Y.N.D.L.R. 72.1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)). **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


Dated:  April 22, 2014
       Albany, New York

Christian F. Hummel
U.S. Magistrate Judge